UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x          **NOT FOR PUBLICATION**

In re                                                          :

                                                               :

IN RE BARBARA K ENTERPRISES, INC.            :          Chapter 11

                                                               :          Case No. 08-11474 (MG)

                                        Debtor.         :

                                                               :

-----------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER DENYING MOTION TO APPROVE
POST-PETITION FINANCING**

**A P P E A R A N C E S :**

PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW, LLP
*Attorneys for the Debtor*
1065 Avenue of the Americas, 18th Floor
New York, NY 10018
By:    Sherri D. Lydell

SILVERBERG, STONEHILL, GOLDSMITH & HABER, P.C.
*Attorneys for Level 10 Capital, LLC*
111 West 40th Street
New York, NY 10018
By:    Jay L. Silverberg
          Mitchell L. Kaplan

OFFICE OF THE UNITED STATES TRUSTEE, REGION 2
33 Whitehall Street
New York, NY 10004
By:    Susan D. Golden
          Paul Schwartzberg

**MARTIN GLENN,**
**United States Bankruptcy Judge**

        Debtor Barbara K. Enterprises, Inc. seeks approval pursuant to 11 U.S.C. §§

105(a) and 364(c)(1)-(c)(3) of a three-month interim debtor-in-possession ("DIP")

financing agreement with BK Acquisition, LLC ("BKA") that would grant BKA liens

and superpriority administrative expense status.  Level 10 Capital, LLC ("Level 10"), one

of Debtor's pre-petition secured creditors, objects to further interim and final approval of

the DIP loan on various grounds, including that the proposed DIP facility would

improperly prime its validly-asserted liens on certain post-petition assets of the estate.

The proposed DIP loan would grant BKA senior liens on property of the estate acquired

post-petition under 11 U.S.C. § 364(c)(2) and junior liens on pre-petition property of the

estate under 11 U.S.C. § 364(c)(3), but Level 10 argues that BKA may only obtain senior

liens on certain post-petition property of the estate under 11 U.S.C. § 364(d)(1), since

Level 10 asserts liens on any royalties obtained by post-petition licenses of Debtor's pre-

petition patents, trademarks and trade names.  As Debtor states it is unable to obtain DIP

financing without granting BKA these liens, both Debtor and Level 10 agree that a

determination as to the scope and validity of Level 10's liens on post-petition assets is a

"threshold" issue for ruling on the interim DIP loan request.

        For the reasons explained below, the Court finds that Level 10 may validly assert

liens on certain post-petition assets in accordance with 11 U.S.C. § 552(b)(1), and that

Debtor's request for a three-month interim financing must be denied.


## **INTRODUCTION**

        Debtor first made its request for post-petition financing on May 5, 2008,

approximately two weeks after the petition was filed.  ECF Doc. # 7.  The motion was

initially a request for interim financing totaling $21,000 with a final request of $500,000

to be addressed at a final hearing on May 22, 2008.  Level 10 appeared at the first hearing

on May 9, 2008 and orally objected to the Debtor's request.  The Court granted approval

of the DIP facility on an interim basis on May 9, allowing Debtor to draw up to $21,000

prior to the final hearing.  ECF Doc. # 19.  Exhibit C to the original motion included a

budget only covering the interim period.  During this first interim period, Debtor actually drew $17,704.

On May 20, 2008, Level 10 filed a written objection to the DIP financing proposal.  ECF Doc. # 24.  On May 22, 2008, Debtor appeared at the hearing and requested, with Level 10's consent, that the matter move forward as a second interim request for financing as opposed to the originally-noticed final hearing.  At the May 22 hearing, the Court approved the second interim request, but indicated that Debtor must provide a budget and further elaborate on plans for the business's reorganization in order to gain final approval of the $500,000 DIP facility.  The second interim request was supported by a second interim budget through the week of June 2, allowing Debtor to draw down an additional $8,405.  The final hearing was scheduled for June 4, 2008.  However, prior to June 4 the parties requested that the final hearing be adjourned to June 13, 2008 to give Level 10 time to brief the issues raised by Debtor in reply papers filed on June 2, 2008.  Level 10 filed its brief on June 11, 2008.  ECF Doc. # 36.

When the motion was originally filed, Debtor stated it had no funds or any working capital whatsoever, and that without emergency funds, Debtor would be unable to make payroll or pay overhead and other necessary business expenses.  In the latest interim proposal (made in Debtor's reply papers prior to the June 4, 2008 hearing, *see* ECF Doc. # 29, with a revised budget submitted on June 11, 2008, ECF Doc. # 35), Debtor seeks approval of a three-month loan (through the end of August), providing for payment of expenses (including wages, insurance, office rent and overhead, travel, and other items) totaling $77,001, as well as a $70,000 payment to Debtor's counsel in August.  Debtor states that it is unable to obtain secured credit without granting BKA liens and superpriority administrative expense status.

The DIP facility originally proposed provided for a maximum of $500,000 at 12% interest per annum.  The maturity date for all funds was to be the earlier of (i) one year, (ii) Debtor's confirmation of a plan, or (iii) conversion or dismissal of this chapter 11 case.  Debtor states that two prepetition liens are asserted on estate assets.  The first lien is held by Jonathan Segal and Level 10 Capital, LLC (each party holding a separate claim for $432,000), extending to substantially all of Debtor's assets.  A second lien for $50,000 is held by BKDM Holdings, LLC, also extending to substantially all of Debtor's assets.[1]  Under the draft order seeking approval of the DIP Facility, funds extended by BKA will have priority over any and all administrative expenses under 11 U.S.C. §§ 503(b) and 507(b), subject to a carve-out for fees paid to professionals retained by the Debtor and any appointed Committee, and subject to U.S. Trustee fees under 28 U.S.C. § 1930(a)(6).  BKA will also obtain a lien on property of the estate acquired post-petition under 11 U.S.C. § 364(c)(2), and a junior lien on pre-petition property of the estate pursuant to 11 U.S.C. § 364(c)(3).

Level 10 objects to extending any further financing to Debtor's business.  Level 10 asserts that it holds a 50% interest in the Second Amended and Restated Promissory Note with a face value of $864,424.30, and a corresponding Amended and Restated Security Agreement dated September 15, 2006.  Based on the Amended and Restated Security Agreement (Objection, Exh. C), Level 10 asserts it has a security interest in all of the Debtor's inventory, equipment, contract rights, rights to payment, receivables, and general intangibles (including goodwill, trade names, and other intellectual property rights).  After Debtor defaulted on the terms of the note in or around June 30, 2007, Level

---

[1]    David J. Myerson, a member of BKDM Holdings, LLC, is also a member of BKA, the proposed Lender in this DIP transaction.

10 commenced a replevin action against the Debtor to recover its collateral in New York

County Supreme Court.  Summary judgment in the case was granted in favor of Level 10

on April 4, 2008 (Exh. E).  After the Supreme Court directed Level 10's counsel to settle

a notice of proposed judgment, this chapter 11 case was filed on April 23, 2008.

Level 10's primary objection is that this bankruptcy case, and additional financing

to fund the business through the bankruptcy case, cannot lead to a successful

reorganization.  Level 10 stated in its first objection (ECF Doc. # 24) that "[t]he Debtor's

business has been a total failure from its inception," and that Debtor's counsel has

admitted that Debtor presently has no product sourcing, no customer orders and no

inventory to speak of.  Level 10 also argues that Debtor cannot account for the

destruction of over $15 million in shareholder value over the last six years, money which

Level 10 says Debtor has raised through approximately 80 separate shareholders and

numerous offerings.  Moreover, Level 10 asserts Debtor has failed to file financial

statements and corporate tax returns for the past 15 months, and that Debtor's books and

records from 2006 and 2008 are incomplete and contain significant gaps, making it

impossible for Level 10 or other creditors to ascertain where this money went.  The

objection also asserts that there are no supporting ledgers, trial balances, sales journals,

cash disbursement and receipt journals, or any inventory of equipment or patents and

trademarks supporting Quickbooks entries.[2]  From August 2007 through April 2008,

Level 10 states that Debtor failed to post a general ledger or to keep any books and

records whatsoever.  Questions are also raised in the objection regarding allegations by

Test-Rite International Co., Ltd. ("Test-Rite") that Debtor diverted funds in violation of a

---

[2]         All books and records of Debtor's business were apparently maintained using the Quickbooks
program.

manufacturing and services agreement; use of entities named "BKI Publishing" or "BKI Publishing, LLC" to conduct certain business for Debtor; and Ms. Kavovit's use of her own personal credit card for business expenses. Under the circumstances, Level 10 states that it would be inappropriate to approve any further funding for the Debtor's business. Level 10 further objects to granting BKA a first priority lien on all "post-petition assets" to the extent this would prime their existing rights under the Amended and Restated Security Agreement, and requests that any financing be limited to a defined budget and remain an interim facility until an evidentiary hearing can take place for a future lift-stay motion or motion to appoint a trustee to be filed by Level 10. Level 10 did agree to the second interim draw on the DIP while preserving its rights to object again at the final DIP hearing.

Debtor filed lengthy reply papers on June 2, 2008. ECF Doc. # 29. Debtor notes that BKA is unwilling to extend financing unless it is granted superpriority status, and as a result Debtor requests that the Court first decide the threshold issue whether Level 10 has a valid first priority lien on any future revenue generated through post-petition licensing agreements. Debtor concedes that Level 10's collateral includes proceeds from pre-petition accounts receivable and proceeds from the sale of pre-petition inventory but disputes that Level 10 has any valid lien on post-petition assets.[3]

Debtor proposed a new budget with the reply to pay expenses through a three-month period (ECF Doc. # 35, Exh. F [as amended]) as well as an "initial business plan"

---

[3]     Debtor made other allegations in the reply, including that Level 10 misled the Court in its objection with its allegations regarding accounting for the destruction of $17 million of shareholder value by failing to disclose that the loss of this value occurred prior to Level 10's investment in the company. Debtor does not dispute that its business losses consumed all of this prior investment. Debtor asserts that these losses were disclosed to Level 10 through offering documents attached to the reply as Exhibit A. Debtor also asserts that Level 10's actions prior to the bankruptcy, in monitoring Debtor's financials and in playing an active role in the company's management, indicate it has *de facto* status as a corporate officer of company. None of the allegations regarding Level 10's good faith in objecting to the DIP facility appear to bear on the basis for extending financing.

to lay out Debtor's proposal for reorganization during the chapter 11 case.  ECF Doc. #

29, Exh. E.  The business plan notes Debtor's primary focus to date on business ventures,

including the retailing of certain do-it-yourself home improvement products targeted

toward women.  Debtor acknowledges that approximately $15 million was invested in the

business since its inception but that an oppressive, 5-year consumer product supply

contract with Test-Rite (which ended December 31, 2007) was one of the primary

reasons for the business's failure.  In addition to the consumer products, the Debtor's

business also included a public relations and marketing segment geared toward media

appearances by Debtor's founder, Barbara Kavovit, on a variety of news and cable

programming shows, websites, and through a bi-weekly column written by Ms. Kavovit

in the New York Post.

Moving forward, Debtor is seeking to continue to make available products from

its consumer products line under a more favorable sourcing agreement that does not yet

exist or, more preferably, through a licensing agreement with a major tool manufacturer.

The business would also offer product development and packaging services "to utilize its

know-how and perception of success in the Target Market [women 18-45]."  Reply, Exh.

E, p. 3.  Licenses for third-party tool manufacturers are envisioned to include use of

existing Barbara K trademarks.  Negotiations had already begun pre-petition with a major

tool manufacturer to license certain Barbara K products (Debtor had retained a consultant

to enter negotiations with this manufacturer pre-petition) and these negotiations are

expected to move forward in the future.  The plan also envisions continuing with

Debtor's media presence in order to maintain the brand value.

Debtor's proposed budget can most appropriately be labeled a "bare-bones"

expense budget to pay Ms. Kavovit's salary and the salary of a bookkeeper; disability and

insurance payments; rent (as a portion of Ms. Kavovit's home rent, $3,000 monthly for the business) and other overhead; trademark registrations; and travel, meals and entertainment related to sales and marketing efforts. Over the three months, $77,001 is to be spent under the revised budget on operating the business, with an additional $70,000 payment in August for counsel's fees. ECF Doc. # 35. The budget does not project *any* revenue.

Level 10 argues that the business plan only speaks generally of Debtor's focus without being supported by any ability to source products or obtain goods for sale. Level 10 also further details problems with Debtor's financials, including an admission that tax returns for the past three years have not been filed, unexplained details in Debtor's Quickbooks records, and questionable debits and credits to Debtor's pre-petition accounts.

Level 10 also asserts that the Uniform Commercial Code grants it a first priority lien on any future revenue generated under post-petition license agreements, in particular from licensing agreements entered into post-petition but concerning intellectual property held by Debtor but pledged to Level 10 in the pre-petition period. In addition to the governing UCC provisions, Level 10 also argues that 11 U.S.C. § 552(b)(1) provides that a pre-petition security interest on pre-petition property of a debtor also "extends to such proceeds, products, offspring or profits [of the pre-petition property] acquired by the estate after the commencement of the case . . . ." While Debtor asserts that the equities of the case would favor priming any valid lien held by Level 10, Level 10 argues that the equities do not favor the Debtor in this case where Debtor has lost over $15 million in shareholder value over the past 5 years, has generated no meaningful sales in 18 months, and has made questionable corporate expenditures.

8

The third interim hearing took place on Friday, June 13, 2008 as an evidentiary hearing. While the Office of the United States Trustee (the "U.S. Trustee") did not file an objection to the proposed DIP facility, a representative of the office was present at the hearing and stated the U.S. Trustee is concerned with allegations that Ms. Kavovit was financing personal expenses through the business, the business's lack of any meaningful current operations or inventory, and a concession by Ms. Kavovit at Debtor's § 341(a) meeting that the company had no prospects for future financing to pay for manufacturing goods. The U.S. Trustee also expressed the view that Debtor's future business is akin to a "start-up" operation.

Debtor called two witnesses—Barbara Kavovit, Debtor's CEO, and David Myerson, an investor, manager, and member of BKA, the DIP lender. Ms Kavovit testified that Debtor has minimal remaining inventory, with shipped orders since the petition filing date accounting for less than $5,000. No further inventory has been produced since the five-year exclusive production agreement with Test-Rite expired in December 2007. The only other significant assets of the business include 14 trademarks and 5 patents. The trademarks include registrations of the "Barbara K" name and several other variations of this name. The five patents were registered for Debtor's products which include a 30-piece tool kit, a roadside safety kit, a "dorm survival" kit, a power screwdriver, and the "power-lite" cordless drill. Ms Kavovit stressed the unique nature of these products which are designed for and marketed exclusively to women. She also described her post-petition efforts to turn the business around, consisting of a generalized plan to build the brand image of Barbara K through public relations work while simultaneously looking to license the Barbara K trademarks and patents to third parties who would actually manufacture products. Ms. Kavovit noted that she was asked to

9

speak in November 2007 at a meeting of the Hardware Marketing Council of America on marketing to women because she has gained notoriety through various media appearances and a bi-weekly column in the New York Post.  Ms. Kavovit asserts that she is widely recognized in the industry for her marketing expertise and her ability to empower women to take on do-it-yourself home improvement projects, thereby creating a larger market audience for the home improvement business that is of value to these companies.

Since her speaking engagement, Ms. Kavovit testified that she has been contacted by several companies, including a manufacturer of home improvement and building products listed on the New York Stock Exchange, to become involved in developing home-improvement products for the business.  Ms. Kavovit explained that negotiations have been extensive and that the home improvement and building products company is primarily interested in Debtor's business expertise in designing products for and marketing to women.  The proposed licensee envisions Barbara K's involvement in creating, packaging, and writing instructions for two separate products—one product to stop running toilets, and one to unclog drains.[4]  According to Ms. Kavovit, the parties are now drafting and redrafting the terms of a contract which would pay a royalty of 2% of products sold for the use of the Barbara K trademark, and 5% for design concepts and consulting services.  Ms. Kavovit testified that she expects to finalize this agreement within one month.  Ms. Kavovit also testified that she has been speaking with a curtain and flooring product manufacturer in Colorado as well as a garage door manufacturer and a clothing/work wear designer on similar royalty agreements to support their product marketing.

---

[4]      Ms. Kavovit indicated these products are not yet named.

However, Debtor has not yet entered into a finalized contract based on these discussions with various tool manufacturers and other retailers.  Little evidence was presented of sales estimations to determine how lucrative any potential contracts would be with these outside companies, even though all royalties to be received by Debtor are based on a percentage of sales.  Ms. Kavovit estimated that wholesale revenues generated from the royalty agreement with the manufacturer of home improvement and building products would be $4,500,000, generating royalty revenue for the Debtor of $300,000.  This income figure was calculated for an undefined period of time.  No estimates were given for Debtor's income based on the other potential licensing agreements.  Mr. Myerson, a representative from the DIP lender, testified that he views Debtor as a "start-up business," but he has investors committed to loan "up to" $500,000 into the company for a short period to see whether the potential licensing agreements pan out.  Mr. Myerson conceded that the DIP proposal would prime existing liens held by Level 10 but views the potential revenue that could be generated by Debtor as a basis for finding Level 10's interest adequately protected by the proposal.  Mr. Myerson acknowledged that BKA is unwilling to lend without having a senior lien on all post-petition assets.

The current financial and organizational state of Debtor is, at best, poor.  On cross-examination, Ms. Kavovit conceded that Debtor has never had a profitable year and shipped less than $5,000 in products since the petition date.  Debtor originally had 20 employees working out of 6,000 square feet of office space but now employs only two persons (Ms. Kavovit and a bookkeeper) with operations run entirely out of Ms. Kavovit's apartment.  Debtor has not filed any tax returns since 2004 or 2005.  As shown in Debtor's Statement of Financial Affairs (Level 10's Exhibit 1), Debtor generated

$205,000 in revenue in 2006; $80,000 in 2007; and $15,000 in 2008.[5]  Level 10's Exhibit

3 is a balance sheet generated as of April 22, 2008 from Debtor's Quickbooks entries

showing assets of approximately $204,118.27, and equity losses of over $15 million

during the past several years.  Level 10's Exhibit 5 is a balance sheet dated December 16,

2006 that was circulated with an offering memorandum.  This exhibit shows the same

losses to equity but values assets at $776,369.79.  In spite of Debtor's successful efforts

to raise more capital, the business financials did not improve between December 2006

and April 2008.[6]

Ms. Kavovit also testified during direct examination that Debtor's plan to license

its "brand image" and to profit on the trademark value of the Barbara K name would

draw on past successes such as Martha Stewart and Ralph Lauren.  Ms. Kavovit stated on

direct that building a brand can take "years and years," acknowledging that the Martha

Stewart and Ralph Lauren brands took up to 20 years before building up the brand value

of their associated trademarks.  On cross-examination, the U.S. Trustee questioned

whether Ms. Kavovit's ambitious schedule for signing licensing contracts (Ms. Kavovit

had estimated that 3-4 contracts would be finalized within one year, and 30 contracts

within 4-5 years) was realistic given the amount of time often needed to build brand

recognition.  Ms. Kavovit responded that Debtor has "started" to build a brand over the

---

[5]      The 2008 revenue figure includes the period from January 1, 2008 through April 22, 2008.
Debtor's bankruptcy petition was filed on April 23, 2008.

[6]      In her testimony, Ms. Kavovit repeatedly explained that the April 22, 2008 balance sheet, Level
10's Exhibit 3, is inaccurate because it was created using Debtor's Quickbooks program, and this program
does not accurately reflect debits and credits on Debtor's books since Debtor's accountant resigned in 2004
or 2005.  That balance sheet reflects as an asset a receivable due from Ms. Kavovit in excess of $280,000.
Ms. Kavovit disputed in her testimony that she owes Debtor any amount, but she offered no documentary
evidence refuting the entry in the balance sheet.  However, there are no other books and records during this
period to demonstrate that Debtor's financial picture is actually better than reflected in the April 22, 2008
balance sheet.  Debtor's inability to maintain accurate books and records over several years and to
document the more questionable expenses supports Level 10's argument that this business cannot
successfully reorganize.

past several years through its "appearance of success" in marketing home improvement products to women, but conceded that building brand recognition would be an ongoing process.

Level 10 called one witness—Ben Landriscina, a principal of Level 10 who acquired an ownership interest of Debtor in early January 2007. Mr. Landriscina was aware of Debtor's financial problems at the time Level 10 purchased an ownership interest, but he testified that he felt at that time that the financials of the business could be improved by eliminating expenditures on "luxuries" and through a planned transfer of management from Ms. Kavovit to another CEO. Mr. Landriscina stated that Ms. Kavovit often had "good ideas" for products and other business ventures but could not successfully manage the company. Luxury expenditures and other "questionable" business expenses noted by Mr. Landriscina included payments of two of Ms. Kavovit's personal SUV's, her parking tickets for these cars, business charges for Pilates classes, a company cell phone for Ms. Kavovit's nanny, first class airfare charges, blackberries for all employees, and a $500/month expense budget for meals and entertainment. Mr. Landriscina testified that Ms. Kavovit was not receptive to his suggestions for reducing expenditures. While there was a planned change in management, Mr. Landriscina testified that Ms. Kavovit eventually changed her mind and refused to step down as CEO. Mr. Landriscina and Level 10 concluded shortly thereafter that the business could not be turned around and brought a replevin action against Debtor to recover its pre-petition collateral. Ms. Kavovit testified on rebuttal that all of the various charges were business-related expenditures, several of which she stated Mr. Landriscina personally approved. Ms. Kavovit does not deny the loss of over $15 million in equity in the business. She

also admitted that Debtor's books and records are inaccurate due to the company's

inability to pay for an accountant over the past several years.

## <u>ANALYSIS</u>

*A. Law Governing DIP Financing*

Sections 364 and 503 of the Bankruptcy Code govern the Court's approval of

post-petition financing.  The relevant provisions read as follows:

> If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.
>
> 11 U.S.C. § 503(a).
>
> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.
>
> 11 U.S.C. § 503(b).
>
> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
> **(1)** with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> **(2)** secured by a lien on property of the estate that is not otherwise subject to a lien; or
> **(3)** secured by a junior lien on property of the estate that is subject to a lien.
>
> 11 U.S.C. § 364(c).
>
> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> **(A)** the trustee is unable to obtain such credit otherwise; and
> **(B)** there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

A debtor may not obtain approval for extending secured credit unless it first establishes that it is otherwise unable to reasonably obtain unsecured credit, and the credit is necessary for continued operation.  11 U.S.C. § 364(c); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (stating that requests for post-petition financing must show the funds are "necessary to preserve the assets of the estate").  Once established, the court then must consider whether the terms of the proposed financing "would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits." *In re Ames Dep't Stores*, 115 B.R. at 37, 40-41 (pointing out reservations to an initial DIP financing proposal with no carve out for professional fees from a super-priority lien granted to bank and limitations on relief from the automatic stay, but granting approval to amended plan which allotted $5,000,000 for professional fees); *see also In re Tenney Village Co., Inc.*, 104 B.R. 562, 567-68 (Bankr. N.H. 1989) (denying approval to DIP financing proposal with a super-priority clause that terminated the agreement if a plan of reorganization was approved over the bank's objection, allotted only $25,000 for a retainer for services by debtor's counsel devoted to any claim or defense against the bank, and which gave the bank extensive managerial control over debtor's business, stating that the plan "would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit . . .").  Any proposal should provide a pre-petition secured creditor with "the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Mosello*, 195 B.R. 277, 288, 293 (Bankr.

S.D.N.Y. 1996) (denying DIP financing approval for plan that required secured creditor

to move forward with risky development proposal so that junior creditors could profit)

(citing *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc)).

Federal Rule of Bankruptcy Procedure 4001(c) and General Order M-274 (Sept.

9, 2002) (the "General Order") also establish guidelines for financing requests pursuant

to 11 U.S.C. §§ 363 and 364.  The General Order requires disclosure of the amount to be

borrowed; material conditions to closing and borrowing; pricing and economic terms,

including fees and lender expenses; collateral, adequate protection, any priority or

superpriority positions, and any carve-outs; maturity, termination and default provisions,

including events of default; and other material provisions or "extraordinary provisions"

as defined within the General Order itself.  Gen. Order, §§ I(A)(2), I(A)(4).  There must

also be disclosure whether any budget to which the debtor will be subject is adequate to

pay all administrative expenses due and payable during the budget and financing period.

Gen. Order, § A(3).  Moreover, efforts to obtain alternative financing and any provisions

regarding funds to be extended on an interim or emergency basis must also be disclosed.

Gen. Order, §§ I(A)(5), I(A)(6).

The General Order defines "extraordinary provisions" to include provisions that

would allow (1) cross-collateralization of pre-petition debt with post-petition assets; (2)

roll-up of pre-petition debt with post-petition financing; (3) concessions as to the validity

of pre-petition debt, assuming no extended timeframe for either an Official Committee of

Unsecured Creditors or other party in interest to object to such a concession; (4)

interference with a debtor's fiduciary duties or provisions divesting the Court of a

material power; (5) waiver of the right to surcharge against collateral pursuant to section

503(c); (6) the granting of liens on avoidance actions; (7) carve-out provisions that

provide disparate treatment to Committee professionals or that do not include U.S. Trustee fees; and (8) termination or event of default provisions based on challenges to a lender's pre-petition lien, orders granting relief from the automatic stay, changes of venue, the filing of motions by certain parties in interest, management changes due to the departure of certain identified employees.  Gen. Order, § II(A).  As to event of default provisions, they are also considered extraordinary if they do not provide at least five business days notice before the automatic stay is terminated or three business days notice before the use of cash collateral ceases.  *Ibid.*  The General Order does not provide that the inclusion of any extraordinary provision prevents approval of a DIP facility, but extraordinary provisions will ordinarily not be approved in interim orders "without substantial cause shown, compelling circumstances and reasonable notice."  Gen. Order, p. 2.  When certain extraordinary provisions are included, Section II(A) also includes specific factors that the Court should consider as to most of the extraordinary provisions before issuing an order granting the proposed DIP financing.

   *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987), is one of the most often cited opinions addressing requirements in seeking to obtain credit pursuant to § 364(c).  To obtain credit, this decision holds that a debtor must prove that (1) the debtor cannot obtain credit unencumbered by super-priority status; (2) the credit transaction is necessary to preserve assets of the estate; and (3) the terms of the agreement are fair, reasonable, and adequate.  *Id.* at 546.  In *Crouse*, the court denied the request to obtain credit after finding that none of the three elements was satisfied.  With regard to element (2), the court determined that the financing request at issue did nothing for the estate "except to keep alive a faint hope that Fidelity will continue to fund [debtors'] efforts on the projects through completion and that it seems quite likely that Federal will dash this

hope by replacing the Crouse Companies with other less financially-troubled contractors

as soon as it is able to do so."

### B.  Law Governing Treatment of Pre-Petition Liens in Bankruptcy

Both Debtor and Level 10 cite 11 U.S.C. § 552(b)(1), arguing that it applies to the

dispute regarding the validity of Level 10's lien on any post-petition assets of the estate.

Section 552(b)(1) states as follows:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this
> title, if the debtor and an entity entered into a security agreement before the
> commencement of the case and if the security interest created by such security
> agreement extends to property of the debtor acquired before the commencement
> of the case and to proceeds, products, offspring, or profits of such property, then
> such security interest extends to such proceeds, products, offspring, or profits
> acquired by the estate after the commencement of the case to the extent provided
> by such security agreement and by applicable nonbankruptcy law, except to any
> extent that the court, after notice and a hearing and based on the equities of the
> case, orders otherwise.

11 U.S.C. § 552(b)(1).

Section 552(a)(1) states the general rule that "property acquired by the estate or

by the debtor after the commencement of the case is not subject to any lien resulting from

any security agreement entered into by the debtor before the commencement of the case,"

but § 552(b)(1) creates "an exception that permits the prepetition security interest to

extend to proceeds, products, offspring or products acquired after commencement of the

case, subject to certain [further] exceptions." 5 COLLIER ON BANKRUPTCY ¶ 552.01 (15th

ed. rev. 2007).  While the distinction between after-acquired property (which is not

subject to pre-petition liens) and "proceeds" of pre-petition collateral (which is) is not

always clear, many courts take guidance from the Supreme Court's decision in *Local

Loan Co. v. Hunt*, 292 U.S. 234, 243 (1934), which forbade "the creation of an

enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt."  5 COLLIER ON BANKRUPTCY ¶ 552.01.  In the Second Circuit, the term "proceeds" in § 552(b)(1) is given significantly broader meaning than the same term as defined in U.C.C. § 9-102(64), allowing the lien to survive conversion to another form of property and to attach to the new property.  *See Bradt v. Woodlawn Auto Workers F.C.U. (In re Bradt)*, 757 F.2d 512, 515 (2d Cir. 1985) ("Proceeds is 'intended to be a broad term to encompass all proceeds of property of the estate.  The conversion in form of property of the estate does not change its character as property of the estate.'") (citing H.R. REP. No. 95-595, at 368 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6324).

Level 10 asserts that its liens on Debtor's pre-petition assets are governed by Article 9 of the U.C.C..  U.C.C. 9-315(a)(2) states as follows:

(a) Except as otherwise provided in this article and in Section 2-403(2):

> (1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
> (2) a security interest attaches to any identifiable proceeds of collateral.

UCC § 9-315(a)(2).

Official Comment 8 to U.C.C. § 9-315 states "[t]his Article deletes former Section 9-306(4), which dealt with proceeds in insolvency proceedings.  Except as otherwise provided by the Bankruptcy Code, the debtor's entering into bankruptcy does not affect a secured party's right to proceeds."

"Proceeds" is defined in U.C.C. § 9-102(64) as follows:

(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
(B) whatever is collected on, or distributed on account of, collateral;
(C) rights arising out of collateral;
(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

U.C.C. § 9-102(64).

Even if there is a valid security interest in post-petition acquired property constituting the "proceeds, products, offspring, or profits" of pre-petition collateral, § 552(b)(1) still allows a court to trump a pre-petition lien to this post-petition acquired property "after notice and a hearing and based on the equities of the case . . . ." Depending on equities of the case, profit or loss of the property may be given to the estate or to the secured party, or apportioned between them. 5 COLLIER ON BANKRUPTCY ¶ 552.04[4][a]. The equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy. *See In re Photo Promotion Assocs*., 61 B.R. 936, 939-40 (Bankr. S.D.N.Y. 1986) (recognizing court has significant discretion to apply pre-petition security interests to post-petition proceeds of property under the equities of the case, and ruling on facts that creditor's security interest did not extend to proceeds from the sale of inventory that required the trustee to expend post-petition funds to make ready for sale);

*United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188, 1191 (4th Cir. 1986)

(holding that cash proceeds received after the bankruptcy was filed, but based on a pre-

petition contract for the supply of coal held as collateral by bank, were subject to the

bank's pre-petition lien, but remanding to the bankruptcy court to determine whether

equitable considerations would be a basis to limit application of pre-petition lien to post-

petition cash proceeds); *see also In re Muma Services, Inc*., 322 B.R. 541, 559 (Bankr. D.

Del. 2005) (denying debtor's request to apply equities of the case to bar bank group from

applying pre-petition security interest in shipping company's accounts receivable to sums

collected on accounts post-petition, noting that the debtors did not invest any

unencumbered funds to enhance the value of these assets so that the equities weighed in

favor of the debtors' request).

 

     *C.  The Validity and Scope of Level 10's Lien*

     Level 10's initial objection to the DIP financing proposal explains the basis for its

security interest in pre-petition collateral.  Exh. A to the objection (ECF Doc. # 24) is a

document dated September 13, 2006 entitled the "Second Amended and Restated Senior

Convertible Promissory Note" (the "Note") for $864,424.30 executed by Barbara

Kavovit, as Chief Executive Officer of Barbara K Enterprises, Inc., in favor of LRG

Capital Group, LLC ("LRG").  Exhibit C is an "Amended and Restated Security

Agreement" (the "Security Agreement") dated September 15, 2006 between Barbara K

Enterprises, Inc. and LRG.  Exhibit B to the objection is an "Assignment of Security

Interest in Trademarks" between LRG and Jonathan Segal, dated January 11, 2007,

which states that Mr. Segal purchased LRG's interest in the Note, and by virtue of this

purchase Mr. Segal was then assigned LRG's security interest under the Security

Agreement.  Finally, Exhibit D is the "Agreement" between Jonathan Segal and Level 10 dated January 11, 2007, granting Level 10 a 50% interest in all of Mr. Segal's right, title and interest in the Note and in the collateral securing the Note pursuant to the Security Agreement.  The Amended and Restated Security Agreement (Exh. A) gave LRG (and subsequently, Mr. Segal and Level 10) an interest "in all assets and property owned by Grantor [Barbara K Enterprises, Inc.]," including, without limitation, all inventory, equipment, receivables, and "general intangibles" which included copyrights, trademarks, trade secrets, good will, trade names, customer lists, patents, use of the Barbara K name, and permits and franchises.  Exh. A, § 1.

Debtor did not initially contest Level 10's assertion of a pre-petition lien but did assert that this lien could not extend to the Debtor's post-petition assets.  However, at the evidentiary hearing on June 13, 2008, Debtor's counsel acknowledged that Level 10 would have a valid lien on any proceeds of royalties from Debtor's pre-petition trademarks, trade names and patents.

Debtor's initial business plan (Exh. E to Reply, ECF Doc. # 29) seeks to continue making available products from a consumer products line under a more favorable sourcing agreement, or more preferably through a licensing agreement with a major tool manufacturer.  The business would also offer product development and packaging services "to utilize its know-how and perception of success in the Target Market [women 18-45]."  Licenses for third-party tool manufacturers are envisioned to include use of Barbara K trademarks.  Both parties essentially concede that Debtor currently lacks any "hard assets" such as inventory upon which Level 10 can assert any interest.  Debtor's business plan also includes a variety of service-oriented work most closely associated with Barbara Kavovit, to which it is difficult to imagine that Level 10 can assert any

interest except to the extent that use is made of copyrights, trademarks, and trade names. However, there is no basis to conclude that Level 10 would not have a valid lien on any royalties or other payments received from Debtor's trademarks and other intellectual property. As to these pre-petition assets, it is clear that Level 10 can assert a valid lien post-petition under § 552(b)(1) on any "proceeds, products, offspring, or profits" stemming from these assets.

Debtor further argues that the equities of the case are a basis here to allow a priming of any valid post-petition lien Level 10 may have on proceeds, products, offspring, or products of pre-petition assets of the estate. The Court disagrees.

Debtor's proposed "bare-bones" expense budget would pay Ms. Kavovit's salary and the salary of a bookkeeper; disability and insurance payments; rent (as a portion of Ms. Kavovit's $7,500 monthly apartment rent, or a $3,000 monthly expense for the business) and other overhead; trademark registrations; and travel, meals and entertainment related to sales and marketing efforts. Over the three months, $77,001 is to be spent on operating the business without generating any revenue, with an additional $70,000 payment in August for counsel's fees. ECF Doc. # 35. As in *In re Muma Services, Inc.*, 322 B.R. 541, 559 (Bankr. D. Del. 2005), there is no basis to conclude that the equities of the case weigh in favor of using the DIP financing to prime Level 10's lien. Rather than using unencumbered estate assets to improve the value of Level 10's collateral interest, as was the case in *In re Photo Promotion Assocs.*, 61 B.R. 936 (Bankr. S.D.N.Y. 1986), Debtor seeks to force the use of Level 10's collateral, or wholly encumbered funds of the estate, to fund a reorganization plan that is highly speculative and puts Level 10's own interests at further risk. Therefore, the Court does not find a

23

basis for allowing super-priority status to the DIP lender secured by all post-petition assets.

The Court may authorize a debtor to obtain credit or incur debt secured by a senior or equal lien only if the debtor is unable to otherwise obtain credit, and secondly only if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Any DIP financing proposal should provide a pre-petition secured creditor with "the same level of protection it would have had if there had not been post-petition superpriority financing."  *In re Mosello*, 195 B.R. 277, 288, 293 (Bankr. S.D.N.Y. 1996) (denying approval of financing for a plan of reorganization that required secured creditor to move forward with risky development proposal so that junior creditors could profit); *see also In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (debtor has burden to demonstrate that a proposal for post-petition financing provides adequate protection when the financing seeks to subordinate an existing lienholder).  The financing proposal would prime Level 10's valid liens on certain post-petition assets, and no adequate protection is offered to compensate Level 10 for the corresponding diminution in its interest.  Accordingly, approval of the DIP facility proposed by Debtor must be denied.

### D.  The Debtor's Prospects to Successfully Organize

Even if Level 10 did not retain valid liens on post-petition assets which constitute the "proceeds, products, offspring, or profits" from Level 10's pre-petition collateral, there would still be an insufficient basis for extending debtor-in-possession financing based on the evidence before the Court.

The Court is aware that its normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not "leverage the bankruptcy process" and unfairly cede control of the reorganization to one party in interest. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). However, this is not to say that the Court does not have an important oversight role. The Court maintains a significant amount of discretion regarding whether to approve the use of debtor-in-possession financing. *Id.* at 37 (stating that approval is subject to a court's discretion, and noting that 11 U.S.C. § 364(c) states that a court "may authorize the obtaining of credit" with superpriority administrative expense status or by securing senior liens on unencumbered property or junior liens on encumbered property). To support a financing request, a debtor should provide evidence of a potential benefit for the estate in obtaining the financing. *In re Simasko Prod. Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (overruling objection to financing agreement based on argument that the debtor's well-drilling operational plan was not economically feasible, after the debtor provided testimony establishing that, in the debtor's business judgment, there could be a significant payoff for creditors if drilling were allowed to move forward). Assuming that an order approving financing is subject to a budget, a debtor is also required by General Order M-274 to demonstrate the adequacy of the budget. *See* Gen. Order, § I(A)(3) (the debtor must demonstrate the adequacy of any budget to which it is subject under an order approving the facility).

Debtor's proposal for moving forward with this bankruptcy case and with the future operations of the company is akin to a start-up business, as opposed to a business seeking to reorganize through chapter 11. These sentiments are shared by the U.S. Trustee as well as BKA, the proposed DIP lender. Debtor's initial DIP financing request

and the amendments thereafter make clear that the company has no unencumbered assets, a fact which necessitated the request for post-petition financing in the first place. Indeed, the lien asserted by Level 10 on assets of the estate purports to cover "all assets and property" owned by Barbara K Enterprises, Inc., including but not limited to inventory, equipment, accounts receivable and other contract rights and rights to payment, general intangibles (including intellectual property rights). ECF Doc. # 24, Exh. C.

The record before the Court shows the highly unlikely prospects for a successful reorganization of the Debtor. The latest three-month budget (ECF Doc. # 35; Level 10's Exhibit 2) projects $70,001 in expenses through August 2008, including salaries for Debtor's two current employees, Ms. Kavovit and a bookkeeper; monthly benefit and insurance premiums; office overhead, including a portion of rent for Ms. Kavovit's apartment, where the business is now operating; trademark registration expenses; and meal and travel expenses. No revenue is projected. The Debtor's "initial business plan" (ECF Doc. # 29, Exh. E) is an eight-page document which speaks in general terms regarding the focus of the business moving forward. It indicates that the business had previously raised over $15 million in 9 separate offerings over its 5-year history, but that an oppressive, exclusive 5-year supply contract was largely responsible for Debtor's financial difficulties, and that Debtor now has "diminishing revenue, little to no cash flow, . . . had substantial debts and some litigation, [and] was severely undercapitalized . . . ." Reply, Exh. E, p. 1. Debtor proposes to continue with the product segment of its business, but "under a more favorable sourcing agreement or, even better, a license agreement with a Major Tool Manufacturer." Reply, Exh. E, p. 3. The generalized statements made in the initial business plan are only supported by further generalized statements made by Ms. Kavovit during the evidentiary hearing on Debtor's plan for

moving forward.  Prospects remain uncertain for actually finding a more favorable

sourcing agreement or license agreement with a major tool manufacturer.  It is highly

questionable whether this initial business plan could support raising venture capital even

if all of Debtor's intellectual property was not already pledged as collateral for the pre-

petition loans.  As explained above, the proposed interim budget makes clear that no

revenue will be generated during this time.  In short, there is no demonstration that

providing further funding for this business (which admittedly can only be funded by

priming liens on all post-petition assets of the estate) will have any benefit to the estate.

   In addition to the uncertainty surrounding Debtor's future prospects, the current

books and records are in disarray.  When Ms. Kavovit was questioned at the evidentiary

hearing concerning particular Quickbooks entries, she often had no idea what the entries

meant or who entered them.  Where documents showed payments for expenses that were

not business-related, Ms. Kavovit asserted, without further supporting evidence, that

"every penny" of any monies paid by the business that were not for business expenses

were reimbursed.  Debtor has been without an accountant since 2004 or 2005, and has not

prepared tax returns during that period.  The April 22, 2008 unaudited balance sheet,

introduced in evidence during the hearing (Level 10's Exhibit 3), shows that Ms. Kavovit

owes the Debtor in excess of $280,000.  Ms. Kavovit disputes owing anything, testifying

that Debtor's books and records are inaccurate.  Debtor's proposed three-month interim

DIP budget did not provide the funds to hire another accountant.

   On these facts, the Court cannot approve of funding this business moving

forward, especially when the funds can only be acquired by priming liens held by one or

more of Debtor's secured creditors.

## <u>CONCLUSION</u>

Since Debtor has indicated that BKA is unwilling to lend unless granted senior liens on all post-petition assets, and since the Court does not otherwise find cause for Level 10 and other secured creditors to bear the risk of reorganizing a business that has no meaningful business plan or budget going forward, the motion for debtor-in-possession financing is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 16, 2008
New York, New York

_____/s/Martin Glenn_____
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE